UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

WOLVERINE FIREWORKS DISPLAY et al.,

      Plaintiffs,                            Case No. 12-10426
                                                    Hon. Thomas L. Ludington

v.

KAREN E. TOWNE, Acting Michigan State
Fire Marshal, in her official capacity,

      Defendant.
_____/

**OPINION AND ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY
INJUNCTION AND GRANTING DEFENDANT'S MOTION TO DISMISS**

The Michigan Fireworks Safety Act, Mich. Comp. Laws §§ 28.451–471 (enacted effective January 1, 2012), requires that firms selling certain types of fireworks purchase liability insurance. Specifically, firms selling "consumer fireworks" (such as roman candles, bottle rockets, and other fireworks of like construction) are required to purchase a liability insurance policy providing coverage "in an amount not less than $10,000,000." § 28.455(d)(3). The issue in this case is whether the particular amount of liability insurance required, $10 million, has any possible rational justification. As explained below, this is answered in the affirmative.

Eight fireworks vendors bring a constitutional challenge to the Act, contending that the insurance requirement violates their substantive due process rights. The plaintiffs concede that the legislature acted rationally in requiring some liability insurance — their challenge, instead, is focused on the specific amount of insurance required. *See, e.g.*, Pls.' Resp. to Def.'s Mot. to Dismiss ¶ 10, ECF No. 22 ("Plaintiffs agree that the Legislature's decision to require retail fireworks locations to carry mandatory insurance is within its power."); Pls.' Br. in Supp. Resp.

to Def.'s Mot. to Dismiss 9 ("Plaintiff[s] [acknowledge] that protection of the public health, safety, and welfare is a legitimate state interest, but [contend] that MCL 28.455(3)'s requirement of $10 million coverage per occurrence per location is not rationally related to furthering that interest where the actual risks and losses associated with the sale and use of consumer fireworks is nowhere close to that amount."). "Of all other states permitting retail sales of consumer fireworks," the plaintiffs write, "only three set a statutory minimum insurance requirement applicable to retail sellers of consumer fireworks. The highest insurance coverage requirement is $2,000,000, with two other states requiring $1,000,000 in coverage." Compl. ¶ 19. Accordingly, the plaintiffs seek an order declaring the insurance requirement unconstitutional and enjoining its enforcement by the state of Michigan.

The state responds by moving to dismiss the complaint for failure to state a claim on which relief can be granted. As the Act regulates economic activity, the state notes, the $10 million insurance policy requirement must be upheld unless the plaintiffs "negate all possible rational justifications for the [challenged statutory requirement]." *Midkiff v. Adams Cnty. Reg. Water Dist.*, 409 F.3d 758, 770 (6th Cir. 2005), *quoted in* Def.'s Mot. to Dismiss 15, ECF No. 21. The state further notes that "the Legislature already considered and rejected the same arguments that the [plaintiffs] make before this Court." Def.'s Mot. 16–17. Specifically, while the legislature was considering the various provisions of the Act, the plaintiffs "submitted written and oral testimony to the Legislature in opposition of the $10 million insurance requirement." *Id*. at 16. The plaintiffs, however, "were unsuccessful in persuading the Legislature that the $10 million insurance requirement was too high." Def.'s Opp'n to Pls.' Mot. for Prelim. Inj. 13, ECF No. 35. The state concludes that this Court should not substitute its judgment for that of the legislature.

The state is correct that the plaintiffs have not stated a claim upon which relief can be granted. "On rational-basis review," the Supreme Court instructs, a challenged statute enjoys "a strong presumption of validity, and those attacking the rationality of the legislative classification have the burden 'to negative every conceivable basis which might support it.' " *F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 314–15 (1993) (internal citation omitted) (citing *Lyng v. Auto. Workers*, 485 U.S. 360, 370 (1988), and quoting *Lehnhausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356, 364 (1973)). "These restraints on judicial review have added force," the Supreme Court cautions, "where the legislature must necessarily engage in a process of line-drawing." *Beach Commc'ns*, 508 U.S. at 315 (internal quotation marks omitted) (quoting *U.S. R.R. Ret. Bd. v. Fritz*, 449 U.S. 166, 179 (1980)).

Here, the parties agree that the legislature's general decision to require fireworks vendors carry insurance has a rational basis. The only question is whether the particular amount required, $10 million in liability insurance, has any possible rational justification. Situations justifying such an amount — a spark causing a cascading series of explosions in a fireworks store where dozens of customers are shopping or igniting an eruption in a fireworks tent situated in a busy shopping mall parking lot — do not strain the imagination. Moreover, the legislative history reveals that the Michigan legislature actually considered such scenarios when deciding on the minimum amount of insurance to require of fireworks vendors.

Although this Court might choose a different minimum coverage baseline, if it were merely a question of what coverage amount was wisest, the time has long since passed that the judiciary may substitute its economic preferences for that of the legislature. Because it cannot be said that the particular baseline the legislature drew is necessarily the product of irrational minds,

the Court will deny the plaintiffs' motion for a preliminary injunction and grant the state's
motion to dismiss the complaint.

**I**

**A**

The Michigan Fireworks Safety Act is not the first instance of Michigan regulating
fireworks sales.  For the forty years prior to January 1, 2012, fireworks sales were governed by
Chapter 34 of the Michigan Penal Code, Mich. Comp. Laws §§ 750.243–750.243e (repealed
effective Jan. 1, 2012); *see generally Burda Bros., Inc. v. Walsh*, 22 F. App'x 423, 426 (6th Cir.
2002) (providing "a brief description of the relevant Michigan fireworks law" under Chapter 34);
*Stajos v. City of Lansing*, 561 N.W.2d 116, 119–20 (Mich. Ct. App. 1997) (same).

Under Chapter 34, fireworks vendors were prohibited from selling "roman candles . . .
bottle rockets . . . or other fireworks of like construction" for private use.  Mich. Comp. Laws §
750.243a(c).  (As discussed below, such fireworks could be sold "for public display.")  The
responsibility for regulating firework vendors was largely delegated to local governments.
Section 750.243a provided in pertinent part:

> 2.  Except as provided in subsection (3) and [§§ 750.243b, 750.243c, and
> 750.243d], a person, firm, partnership, or corporation shall not offer for sale,
> expose for sale, sell at retail, keep with intent to sell at retail, possess, give,
> furnish, transport, use, explode, or cause to explode . . .
>
>> c.  firecrackers, torpedoes, skyrockets, roman candles, daygo bombs, bottle
>> rockets, whistling chasers, rockets on sticks, or other fireworks of like
>> construction. . . .
>
> 3.  A permit is not required for the following . . .
>
>> c.  Sparklers containing not more than .0125 pounds of burning portion per
>> sparkler.
>
>> d.  Flitter sparklers in paper tubes not exceeding [one-eighth] inch in
>> diameter, cone fountains, and cylinder fountains.

      e.  Toy snakes not containing mercury, if packed in cardboard boxes with not more than 12 pieces per box . . . .

§ 750.243a(2)–(3) (repealed effective Jan. 1, 2012).  Section 750.243b, in turn, authorized local governments to grant permits for fireworks otherwise prohibited under § 750.243a for "public display," providing:

1.  [Local governments] may grant a permit for the use of fireworks otherwise prohibited by section 243a, within their political jurisdiction . . . for public display by municipalities, fair associations, amusement parks, or other organizations or groups of individuals approved by the city, village, or township . . . .

2.  [Local governments] may grant a permit . . . to a resident wholesale dealer or jobber to have in his or her possession within the political jurisdiction, fireworks otherwise prohibited by section 243a, for sale only to holders of permits as provided in this section.

3.  Before a permit . . . is issued, the person, firm, or corporation making application therefore shall furnish proof of financial responsibility by a bond or insurance in an amount deemed necessary by the local governing authority.

§ 750.243b(1)–(3) (repealed effective Jan. 1, 2012).

To summarize, under Chapter 34 private persons were not permitted to "possess, . . . use, explode, or cause to explode . . . firecrackers, torpedoes, skyrockets, roman candles, daygo bombs, bottle rockets, whistling chasers, rockets on sticks, or other fireworks of like construction."  § 750.243a(2).  Consequently, fireworks vendors in Michigan could not sell such fireworks to private persons.

Vendors could sell to "groups of individuals," but only if the vendors obtained a permit from the local government.  § 750.243b(1).  To receive a permit, the applicant was required to "furnish proof of financial responsibility by a bond or insurance in an amount deemed necessary by the local governing authority."  § 750.243b(3).  Moreover, the fireworks could not be sold for private use — they had to be for "public display."  § 750.243b(1).

**B**

The Michigan legislature repealed these restrictions, as noted, effective January 1, 2012. In their place, the legislature enacted the Michigan Fireworks Safety Act. As explained below, the Act broadens the availability of "consumer fireworks" (such as roman candles, bottle rockets, and other fireworks of like construction), permitting their sale for private use. But the Act also requires the vendors to maintain a significant amount of liability insurance.

**1**

Prior to becoming law, however, the Act was contained in House Bill 4293. It passed in the Michigan House of Representatives on October 19, 2011, by a vote of ninety-eight to ten. Received by the senate the following day, the bill was referred to the senate regulatory reform committee for consideration.

The senate committee scheduled a hearing on the bill for the following month. A number of persons, including representatives of two plaintiffs in this case, submitted written testimony to the committee. "I wish to express my opposition to House Bill 4293," a representative of Plaintiff Great Lakes Fireworks wrote, explaining: "my biggest opposition comes as a result of the $10 million liability insurance requirement. It is my understanding that this will be the highest limit in the country by $8 million. The cost of this high policy limit is very restrictive to any small business." Def.'s Mot. Ex. 2, at 2.

A representative of Plaintiff Captain Boom also wrote to the committee in opposition the insurance requirement. The gentleman asserted that the insurance requirement "will dramatically affect the fireworks and retail industries in Michigan." *Id*. at 16. He acknowledged "that a retailer can obtain [the required insurance] as an additional insured from [a] wholesaler," but cautioned,

Problems with obtaining coverage through a wholesaler include the following:
1. It ties the retailer to a single wholesaler. Most fireworks retailers purchase from more than one wholesaler. . . .
2. Obtaining additional insurance through a wholesaler will give the wholesaler undue influence in the operation of the independent retail business. . . .
3. The ability to obtain $10 million liability insurance from a fireworks wholesaler is extremely limited, as most importers and wholesalers simply don't carry that much insurance.
4. Coverage as an additional insured will not likely contain the protection that the retailer wants or needs, limiting free market choice of insurance products. Additional insured status is not an acceptable option for my business. . . .

In summary, requiring $10 million insurance in order to sell an item that the Consumer Product Safety Commission deems safe for consumers to use without training or supervision is simply ludicrous. I request an amendment to lower the insurance requirement to $1 million.

*Id*. at 17. Others wrote in support of the bill, such as the Michigan Fire Service Coalition (a coalition that includes, among others, the Michigan Association of Fire Chiefs, the Michigan Professional Fire Fighters Union, and the Michigan Fire Inspectors Society). *Id*. at 5.

### 2

On November 3, 2011, the senate regulatory reform committee held a hearing on House Bill 4293. A number of persons testified. Among them was a representative of B.J. Alan Company (a wholesaler marketing fireworks under brands such as Phantom Fireworks). The gentleman first testified regarding his firm's opposition to the insurance requirement, noting: "Our company carries this much insurance and would not be affected by this provision. Most sellers would be." *Senate Regulatory Reform Comm. Hearing: House Bill 4293*, at 13 (Mich. Nov. 3, 2011), *attached as* Def.'s Opp'n Ex. 2. The gentleman further testified in opposition to the "tent sales" provision of the Act, which authorizes vendors operating retail locations out of tents (rather than permanent structures). The gentleman testified:

[The National Fire Protection Association] specifically requires that aerial devices in a consumer retail sales facility be packaged and displayed [in] a manner that will limit travelled distance of ejected pyrotechnic components if ignition of the fireworks occur. Tents do not have a system to provide for such restraint of aerial

devices which makes a fire in a fireworks tent particularly dangerous, because the canvas tent will burn through quickly as compared to a roof system.  A fire in a tent will definitely result in aerial fireworks discharging and travelling substantial distances from the tent.  If an aerial product is designed to climb 125 to 150 feet straight up, imagine the distance if the trajectory of the flaming product is of an arcing linear type.  The danger to adjacent structures, vehicles and people would be significant especially considering the most popular and common tent locations are in the parking lot immediate vicinity of extreme high traffic areas such as big box chain stores, malls, strip plazas and gas stations.

*Id*. at 13–14.

Representatives of two other fireworks vendors testified in support of the Act.  The first, a representative of Berta Brothers, Inc., testified:

We are a small Michigan based business.  I'm born and bred here.  We're in total support of the bill.  I don't think that any bill can ever be 100 percent pleasing to everyone.  And from my small business point of view, we're willing to work within the confines of the bill and the increased understanding of the way businesses should be run in the fireworks industry in Michigan.  It can only increase our opportunity personally to grow our business, and I think it would be great for the state of Michigan.

*Id*. at 24.  The second, a representative of Big Fireworks, testified that the Act would be good for small businesses in Michigan:

My name is Ben Bakken.  I'm the Chief Financial Officer of Big Fireworks.  It's a Michigan based family owned, small business founded here in Lansing several decades ago.  You've heard some testimony today with regard to concerns . . . .

The question is, who would benefit from this bill being struck down and not passed today?  The answer is, Indiana and Ohio based companies who have reaped the rewards of the prior Michigan law . . . .

As a Michigan based fireworks company who does business in Indiana, I have a unique perspective.  I'll also point out that prior to being Chief Financial Officer of Big Fireworks, I was Vice-President . . . .  When the discussion several years ago became about the potential legislation here in Michigan, my immediate concerns were those Indiana stores owned by Big Fireworks and what the impact to them would be.  Now as a CFO can tell you that when this legislation passes they will likely close.  The bill will benefit the Michigan companies, tax payers, job seekers, but it will negatively impact those Ohio and Indiana companies that have benefited from the prior legislation.

In conclusion what I would say is that this bill is something to be very proud of. It's a great example of bipartisan support and collaboration for five years to get to this point.

*Id*. at 30–32.

Senator Joe Hune then inquired how the $10 million insurance requirement was developed, explaining: "I assume that came up numerous times in years past and I wasn't involved within those discussions." *Id.* at 32. Mr. Bakken deferred to a vice president of Big Fireworks, Jim Stamos, who explained:

The 10 million dollar insurance policy was come up over the course of many discussions [on] how to make sure that the residents of the State of Michigan were safe. . . . [E]verybody got together and finally hashed [it] out. But if there was an accident and somebody was hurt and it was busy and it was one of the senators that actually brought it up, if there [were] five people in there and they got hurt, would a million dollar policy be sufficient? And the answer to that is no. And a million is not enough. Maybe even 10 million is not enough. As the states legalize, they're going more towards the 5 million dollar policy and now like in the State of California, nothing is written besides a 10 million dollar policy. You know I guess it's like auto insurance or anything else. At one time 1 million dollars seemed to be a lot of money. 10 million isn't anymore.

The difference with the fireworks industry is though you can't go out to Farm Bureau Insurance or Auto Owners and get a high risk policy like this. While we believe it's a safe product that we are selling, it is a high risk policy. It's underwritten at the end of the day by Lloyds of London. And while a lot the people that we sell to are churches and small individuals are setting up tents, as a fireworks provider, we have to provide insurance for our customers and I dropped off a little pamphlet up there.

In 2011 to add a retailer selling fireworks as an additional insured, you can see some different costs and I only put five companies out there. But every wholesale fireworks company in the country sells insurance to their customers. At the end of the day they can't go out and get one of these policies. The minimum start for even a million dollar policy is $5,000 and they won't issue to new businesses. So as a wholesaler ourselves, we have to provide it to our customers. And those fees start at [$]236 and if you look at all five companies there, the highest out of any of those is $450. So for less than $500 somebody could be insured to sell fireworks.

I guess to finalize, to answer your question, the reason I came up with the 10 million dollars was for the citizens of Michigan. And the only ones that it ends up

hurting at the end of the day are the bootleggers and the people who are uninsurable.

*Id*. at 33–35.

Following the hearing, the committee referred the bill back to the senate, recommending that the senate pass the bill. On November 9, 2011, the senate did so, by a vote of thirty-three to one. Technical amendments and reconciliations by both chambers followed.

Finally, on December 13, 2011, the governor signed into law Act 256 of 2011, the Michigan Fireworks Safety Act.

**B**

Codified in sections 28.451 through 28.471 of the Michigan Compiled Laws, the Act broadens the availability of fireworks to consumers in Michigan by permitting the sale of "consumer fireworks" for private use. "Consumer fireworks" is a defined term under the Act; it "means fireworks devices that are designed to produce visible effects by combustion, that are required to comply with the construction, chemical composition, and labeling regulations promulgated by the United States consumer product safety commission under 16 CFR parts 1500 and 1507, and that are listed in APA standard 87-1, 3.1.2, 3.1.3, or 3.5." Mich. Comp. Laws § 28.452(e). The "APA standards" referenced are the definitions promulgated by the American Pyrotechnics Association. For example, among the fireworks defined in standard 3.1.2, "Aerial Devices," are "bottle rocket" and "roman candle." APA standards 3.1.2.3, 3.1.2.4.

The Act further provides that the definition of "consumer fireworks" excludes "low-impact fireworks." Mich. Comp. Laws § 28.452(e). "Low-impact fireworks" is a defined term; it means, for example, "handheld sparkling devices as that phrase is defined under APA standard 87-1, 3.1, 3.1.1.1 to 3.1.1.8, and 3.5." Mich. Comp. Laws § 28.452(e).

The Act also identifies the particular amount of liability insurance required.  Specifically, "each retail location selling consumer fireworks either shall be added as an additional insured, or public liability and product liability insurance coverage shall be obtained and maintained, in an amount not less than $10,000,000.00 per occurrence."  Mich. Comp. Laws § 28.455(3)(d).  Subsection 28.455(3)(d) also creates a civil fine of up to five thousand dollars for noncompliance, providing: "A person that knows, or should know, that he or she is required to comply with this subsection and who fails or neglects to do so is liable for a civil fine of not more than $5,000.00." *Id.*

In sum, the Act expands the types of fireworks that vendors may sell for private use in Michigan.  But the Act also imposes a significant insurance requirement on vendors that choose to enter this market.

## II

### A

On February 1, 2012 (one month to the day after the Act went into effect), eight fireworks vendors brought in suit this Court.  The plaintiffs included Wolverine Fireworks Display, Inc.; F&F All Seasons, Inc.; Captain Boom Fireworks Productions, LLC; Ace Pyro, LLC; RKM Fireworks Co.; P&P Imports, Inc.; Pyrotek, Inc.; and Great Lakes Fireworks, LLC.

The two-count complaint seeks declaratory and injunctive relief.  Count one, which seeks declaratory relief, asserts in pertinent part:

> MCL 28.455(3), requiring retailers of consumer fireworks to obtain $10 million in insurance coverage, is invalid and unconstitutional insofar as it impairs Plaintiffs' fundamental right to engage a legal business specifically authorized by statute, without any rational basis or relationship to the protection of public health and safety, thereby violating the Fourth, Fifth and Fourteenth Amendments.

Compl. ¶ 30.  (The complaint does not specify what particular Fourth Amendment rights the statute violates.)  Count two, which seeks injunctive relief, asserts:

> MCL 28.455(3) as described above, injure[s] Plaintiff in its pursuit of its established legal and profitable business, insofar as the irrational and onerous $10 million insurance coverage requirement threatens to render Plaintiff's business unprofitable. . . .
>
> Although Plaintiffs might be able to obtain monetary compensation and damages, the law holds that the destruction of an ongoing legal business, along with its goodwill is irreparable and that the mere awarding of damages is not an adequate remedy at law.

*Id*. ¶¶ 33, 35.  The same day that they filed a complaint, Plaintiffs moved for a preliminary injunction, asserting:

> There is no scientific authority on which Defendants do or can rely for MCL 28.455(3)'s irrational and onerous $10 million insurance requirement, which has the practical effect of depriving Plaintiffs of all economic benefit of their existing businesses.
>
> Because MCL 28.455(3) impairs Plaintiffs' fundamental right to engage in a legitimate enterprise, it is subject to strict scrutiny.  Where Michigan requires retailers of consumer fireworks to obtain insurance coverage in an amount five to ten times greater than that required by any other state, it is clear that MCL 28.455(3) cannot survive strict scrutiny.
>
> For the same reason, even if Plaintiffs' fundamental rights were not impaired by MCL 28.455(3), the statute could not survive rational basis review because the insurance coverage requirement is not rationally related to any risk to the public health, safety, or welfare arising out of Plaintiffs' business activities.

Pls.' Mot. Prelim. Inj. ¶¶ 6–8.

## B

Since filing their motion, Plaintiffs have filed more than a dozen separate sets of supplemental papers.  *See* ECF No. 5 (Steinburg & Pease affidavits, filed February 4); ECF No. 6 (first supplemental memorandum, filed Feb. 11); ECF No. 7 (Stringer affidavit, filed February 15); ECF No. 8 (first supplemental request for hearing, filed February 22); ECF No. 11 (Beltz

affidavit, filed February 23); ECF No. 13 (second supplemental memorandum, filed February 26); ECF No. 16 (Towne affidavit, filed March 1); ECF No. 18 (third supplemental memorandum, filed March 13); ECF No. 19 (second supplemental request for hearing, filed Feb. March 13); ECF No. 23 (fourth supplemental memorandum, filed April 9); ECF No. 25 (fifth supplemental memorandum, filed April 16); ECF No. 29 (sixth supplemental memorandum, filed April 24, 2012); ECF No. 32 (seventh supplemental memorandum, filed May 11, 2012); ECF No. 34 (attaching 2001 APA Standard 87-1, filed May 18, 2012).

Three days after filing suit, Plaintiffs made their first supplemental filing, attaching exhibits containing affidavits of two gentlemen. ECF No. 5 (Steinburg & Pease affidavits). These gentlemen testify to the burden that the insurance requirement imposes. Specifically, Mr. Steinburg, an expert witness in pyrotechnics, offers a multi-jurisdictional survey of fireworks laws, observing: "There are 41 states that allow sale and use of some or all types of consumer fireworks permitted by federal regulations. I am aware of three states with statutory insurance requirement to sell consumer fireworks. Two states, Idaho and Rhode Island, require $1 million insurance, and Pennsylvania requires $2 million." Steinburg Aff. ¶¶ 4–5. Mr. Pease, an owner of one of the firms that is a Plaintiff in this case, testifies regarding the burden that the insurance requirement imposes. He writes: "I have made attempts to cost out and obtain that insurance and have found out that my insurance could triple or more depending on sales." Pease Aff. ¶ 5.

On February 11, Plaintiffs filed their first supplemental memorandum in support of their motion. ECF No. 6. In it, Plaintiffs identify a vagueness challenge to § 28.455(3)(d), writing:

> Plaintiffs now present the Affidavit of John Stringer of Drayton Insurance . . . . According to Mr. Stringer, the language "per occurrence" is standard in some policies and, according to its ordinary usage within the industry, would apply to every sale made at every location . . . .

> There is an arguable contradiction within MCLA 28.455(3) because in its first line it references "each retail location selling consumer fireworks."  The net result is that First Amendment issues of vagueness are raised, in addition to Fifth and Fourteenth Amendment issues of due process and rational basis.  Neither Plaintiffs nor their attorneys appreciated this potential distinction and interpretation at the time of the filing of their Complaint.

Pls.' Supp. Mem. 2.  Plaintiffs do not elaborate on what First Amendment rights are implicated.  And, not wishing to advance the vagueness challenge unnecessarily, Plaintiffs conclude the memorandum by noting: "The question of whether the provision might be unenforceable as vague and contradictory is not a determination which the Court must necessarily reach."  *Id*. at 3.

An independent review of Mr. Stringer's affidavit reveals that it addresses Plaintiffs' concern.  The gentleman does not in fact suggest that "per occurrence" means "per sale."  Rather, he explains that "each retail location" means just that — under the statute, each retail location must maintain $10 million in insurance.  He further opines that this requirement may have unintended consequences, explaining: "[T]he Michigan statute's requirement that each retail location must carry public and product liability insurance in the amount of $10 million per occurrence means that fireworks companies with multiple retail locations would have to individually incorporate each retail location and purchase separate policies for each location.  Otherwise, the product-aggregate or general-aggregate limits of a single policy would be spread over multiple locations."  Stringer Aff. ¶ 7.

On February 23, Plaintiffs again supplemented their pleadings, filing the affidavit of a third gentleman.  ECF No. 11 (Beltz affidavit).  This gentleman, another owner of one of the firms that is a party to this case, explains: "I am the owner of Great Lakes Fireworks, LLC, a display fireworks company doing business putting on holiday fireworks at 55 locations . . . .  I ordinarily purchase insurance coverage for my fireworks display in the amount of $5,000,000, which until this year has been deemed sufficient by the various local governments with whom I

-14-

do business.  Since the passage of the new Michigan fireworks statute, I have already received a
request from a municipality that I obtain $10 million in liability insurance."  Beltz Aff. ¶¶ 1, 3–4.

On February 26, Plaintiffs supplemented their first supplemental memorandum.  ECF No.
13 (second supplemental memorandum).  The "addendum to the supplemental memorandum,"
Plaintiffs explain, is necessary to correct an error in the prior memorandum.  They elaborate:

> [The] Supplemental Memorandum of February 11, 2012 suggested that the State
> Fire Marshal's office was not proceeding with the development of applications
> and certificates for consumer fireworks sales pending this Court's decision.
> Based on communications with the Fire Marshal's office and with the Attorney
> General, that does not appear to be true.  While the process is behind schedule, it
> is ongoing.

Pls.' 2d Supp. Mem. 1–2 (internal citation omitted).

On March 1, Plaintiffs again supplemented their supplemental exhibits by filing another
affidavit of an insurance broker.  ECF No. 16 (Towne affidavit).  "To my knowledge," the broker
writes, "an insurance policy providing coverage of $10 million per occurrence, per location,
without any product-aggregate or general-aggregate limits is extremely difficult to obtain and if
obtained would be very expensive to the business owner and thus be passed on to the consumer."
Towne Aff. ¶ 7.

On March 13, Plaintiffs once again supplemented their supplemental memorandums.
ECF No. 18 (third supplemental memorandum).  Addressing whether the insurance requirement
is severable from the rest of the Act, Plaintiffs write:

> The remaining subsections of MCL 28.455 require retailers of consumer
> fireworks to comply with the requirements of NFPA 101 and NFPA 1124, to be
> licensed under the general sales tax act, and to have a valid federal taxpayer
> identification number.  When read in conjunction with the other sections of the
> Act, it is clear that severing only MCL 28.455(3) would leave the remainder of
> the statute complete and operative.

Pls.' 3d Supp. Mem. 3.

## C

On April 2, Defendant timely filed its first pleading with this Court, moving to dismiss the complaint for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). ECF No. 21. Defendant first argues that the insurance requirement of § 28.455(3)(d) is subject to rational basis review, not strict scrutiny. Defendant further argues the requirement should be upheld because

> the legislative history indicates that the Legislature was well aware of the debate within the industry surrounding the insurance requirement. Many of the Plaintiffs already submitted written and oral testimony to the Legislature in opposition of the $10 million insurance requirement. An early version of the House Bill had the insurance requirement set at $2 million, but subsequent versions in both the House and the Senate raised that threshold to $10 million. This history shows that the Legislature already considered and rejected the same arguments that the [Plaintiffs] make before this Court.

Def.'s Mot. 16–17 (internal citations omitted). Addressing Plaintiffs' argument that the statute imposes an insurmountable barrier to entry into the new market for supplying these products, Defendant observes that several hundred of Plaintiffs' competitors disagree:

> As of March 29, 2012, the Fire Marshal has received over 650 applications for certificates required under Section 4 of the Act, Mich. Comp. Laws § 28.454, to sell consumer fireworks. Contrary to [Plaintiffs'] assertions, the Act is not having any significant detrimental effect on the willingness of Michigan businesses to sell fireworks to Michigan's citizens during the summer holiday season.

Id. at 5. And addressing Plaintiffs' vagueness argument, Defendant writes:

> The Fire Marshal takes the position that "per occurrence" is an insurance standard phrase meaning "per event" or "per incident," and not "per transaction," or "per sale." In other words, all injuries and damages arising out of a single fireworks accident would be subject to a $10,000,000 cap. The Fire Marshal has confirmed with several national companies specializing in fireworks insurance that such coverage is available.

Id. at 10. Defendant concludes by requesting that this Court dismiss the complaint.

One week after the motion to dismiss was filed, Plaintiff responded.   ECF No. 22.

Contesting Defendant's statutory interpretation, Plaintiffs reference their previously filed expert

affidavits and reiterate that "per occurrence" is unconstitutionally vague:

> Defendant takes the position that the "per occurrences" language in the statute
> means "per event" or "per incident," not "per transaction" or "per sale."   But
> Defendant offered no affidavit or other evidence in support of that position.
> Further, that position is not reflected in any of the emergency rules attached to
> Defendant's Motion.   Thus, Defendant's *ipse dixit* declaration is unsupported and,
> according to the affidavits filed by Plaintiff, incorrect.   Despite the Fire Marshal's
> unsubstantiated assertion that they have "confirmed with several national
> companies who specialize in fireworks insurance that such coverage is available,"
> there is no specification who said what to whom or what question propounded.
> There is no affidavit.   That claim means nothing.

Pl.'s Resp. to Def.'s Mot. to Dismiss ¶ 5.   Turning to Defendant's argument regarding rational

basis review, Plaintiffs write:

> Plaintiffs agree that the Legislature's decision to require retail fireworks locations
> to carry mandatory insurance is within its power.   But insofar as that power is
> exercised in irrational, vague, confiscatory manner unrelated to public health,
> safety or welfare, it should be analyzed under the "rational basis" test.   Further, as
> shown here and in Plaintiffs' contemporaneously filed Supplemental Motion for
> Preliminary Injunction, the confusion about the meaning of this penal statute and
> the interpretations of the insurance provision involved, including the riders as
> "additional insureds" on wholesalers' policies, render the statute, which must be
> strictly construed, unconstitutionally vague.

*Id*. ¶ 10.   Plaintiffs conclude by requesting that the Court deny Defendant's motion.

## D

The same day as Plaintiffs filed their opposition brief, they also filed a supplemental

memorandum in support of their motion for a preliminary injunction.   ECF No. 23 (fourth

supplemental memorandum).   Although the memorandum does not cite any case law, it again

argues that the insurance requirement is unconstitutionally vague, asserting:

> The provision itself refers in two different places in one paragraph to the
> insurance being required "per location" and the insurance being required "per
> occurrence".

In their Motion to Dismiss, Defendant claims to have interpreted that provision to mean something other than "per sale" or "per transaction," although their purported interpretation utilizes language not in the statute, "incident" and accident.

Plaintiffs point out that this statement by the Attorney General in a pleading before this Court is nowhere set forth in any statutory, legislative, regulatory materials or opinion, including the emergency regulations which were promulgated by Defendant on March 10, 2012.

However, as is shown by the attached affidavits of practicing fireworks insurance brokers Tami Towne and Deborah M. Merlino, regardless of how the Fire Marshall unofficially claims to interpret the statute, it is the insurance companies and the common usages within the industry which will control in the event an injury occurs and a claim is made.  According to them, the Attorney General's interpretation of the statute is inaccurate.  The result is that, if the Fire Marshall ultimately properly interprets the statutory language "per occurrence" in conformity with the practices of the insurance industry, then it will be impossible for anyone, even the wholesalers, to comply with the statute and no company will issue such a policy. . . .

These post-filing developments lead to an additional argument by Plaintiffs for a Preliminary Injunction against the enforcement of the statute as it relates to the $10,000,000 insurance provision this fireworks season because the statute is void for vagueness.  No local fire enforcement official, state police officer, state fire marshal or those acting under their control or at their direction can know whether a particular operation or insurance policy violates the statute, independently of the ability of the insurers to deny coverage in the event that something which has never happened (the Plaintiffs have had no claims) does in fact happen.

Pl.'s 4th Supp. Mem. ¶¶ 8–11, 17.

An independent review of Ms. Merlino's affidavit reveals that Plaintiff's concern is addressed.  She does not suggest that Attorney General's interpretation of the statute is inaccurate.  Rather, like Mr. Stringer, Ms. Merlino testifies that insurers generally require a policy limit, explaining: "I have marketed the $10 million coverage with 12 insurance companies.  None of those companies would write the coverage on a 'per occurrence' basis without an aggregate limit."  Merlino Aff. ¶ 5.

-18-

One week after filing their fourth supplemental memorandum, Plaintiffs filed their fifth. ECF No. 25 (fifth supplemental memorandum).  This memorandum directs the Court to the previously filed affidavit of Mr. Stringer and informs the Court that the gentleman "maintains his position."  Pl.'s 5th Supp. Mem. 2.

Ten days later, Plaintiffs filed their sixth supplemental memorandum.  ECF No. 29 (sixth supplemental memorandum).  Attached is a certificate of liability insurance obtained by a vendor who is not a party to this litigation (American Eagle Fireworks).

To summarize, in their papers Plaintiffs identified two fundamental constitutional challenges to the insurance requirement.  First, Plaintiffs allege, the requirement offends the substantive due process protections of the Fourteenth Amendment because it lacks a rational basis.  And second, the "per occurrence" insurance requirement is unconstitutionally vague.

To ensure that the substantive due process issue is fully briefed prior to rendering a decision, the Court directed supplemental briefing in an order issued May 4, 2012.  *Wolverine Fireworks Display v. Towne*, No. 12–10426, 2012 WL 1570864 (E.D. Mich. May 4, 2012).  Finding the parties' papers sufficiently briefed the vagueness challenge, in contrast, the Court addressed that claim's merits in its May 4 order.

**E**

"Per occurrence" is not unconstitutionally vague, the Court found in its May 4 order.  *Wolverine Fireworks*, 2012 WL 1570864, at *10.  As a preliminary matter, the Court first discussed the standards for evaluating whether a statute is void for vagueness.

"Living under a rule of law entails various suppositions, one of which is that all persons are entitled to be informed as to what the State commands or forbids."  *Papachristou v. City of Jacksonville*, 405 U.S. 156, 162 (1972) (internal quotation marks and alterations omitted)

-19-

(quoting *Lanzetta v. New Jersey*, 306 U.S. 451, 453 (1939)).   Accordingly, the Supreme Court

has long held that "a statute which either forbids or requires the doing of an act in terms so vague

that men of common intelligence must necessarily guess at its meaning and differ as to its

application violates the first essential of due process of law."   *Connally v. Gen. Constr. Co.*, 269

U.S. 385, 391 (1926) (citing *Int'l Harvester Co. v. Kentucky*, 234 U. S. 216, 221 (1914); *Collins*

*v. Kentucky*, 234 U. S. 634, 638 (1914)).   The Court explains:

> Vague laws offend several important values.  First, because we assume that man
> is free to steer between lawful and unlawful conduct, we insist that laws give the
> person of ordinary intelligence a reasonable opportunity to know what is
> prohibited, so that he may act accordingly.  Vague laws may trap the innocent by
> not providing fair warning.  Second, if arbitrary and discriminatory enforcement
> is to be prevented, laws must provide explicit standards for those who apply them.
> A vague law impermissibly delegates basic policy matters to policemen, judges,
> and juries for resolution on an ad hoc and subjective basis, with the attendant
> dangers of arbitrary and discriminatory applications.

*Vill. of Hoffman Estates v. Flipside*, 455 U.S. 489, 498 (1982) (quoting *Grayned v. City of*

*Rockford*, 408 U.S. 104, 108–09 (1972)).

The Court cautions, however, that "[t]hese standards should not, of course, be

mechanically applied," elaborating:

> The degree of vagueness that the Constitution tolerates — as well as the relative
> importance of fair notice and fair enforcement — depends in part on the nature of
> the enactment.  Thus, economic regulation is subject to a less strict vagueness test
> because its subject matter is often more narrow, and because businesses, which
> face economic demands to plan behavior carefully, can be expected to consult
> relevant legislation in advance of action.

*Flipside*, 455 U.S. at 498 (footnote omitted); *see also Papachristou*, 405 U.S. at 162  ("In the

field of regulatory statutes governing business activities, where the acts limited are in a narrow

category, greater leeway is allowed.").

Likewise, "The Court has also expressed greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe." *Flipside*, 455 U.S. at 498–99.   The Sixth Circuit adds: "When the persons affected by the regulations are a select group with specialized understanding of the subject being regulated the degree of definiteness required to satisfy due process concerns is measured by the common understanding and commercial knowledge of the group." *Fleming v. U.S. Dep't of Agric.*, 713 F.2d 179 (6th Cir.1983).

In this case, Plaintiffs challenge the term "per occurrence" as vague.   Contrary to Plaintiffs' contention, "occurrence" is a commonly used term in the insurance industry.   The Supreme Court notes, for example, that "[commercial general liability] insurance has traditionally been sold in the United States on an 'occurrence' basis, through a policy obligating the insurer 'to pay or defend claims, whenever made, resulting from an accident.' " *Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 771 (1993); *see generally* Tom Baker, *Insurance Law and Policy*, 388–93 (2d ed. 2008) (discussing standard insurance policies providing coverage for "occurrences," i.e., "accidents"); John Dobbyn, *Insurance Law in a Nutshell* 44 (West 2003) (noting commercial general liability policies "require that the injury result from an occurrence" and that occurrence "is defined in the standard policy as an accident"); Robert E. Keeton & Alan I. Widiss, *Insurance Law* § 5.10(d)(1), at 594–96 (3d ed. 2003) (discussing liability coverage for "occurrences").

Liability insurers widely understand the term "per occurrence."   It means "per accident." Reinforcing this conclusion are the affidavits of Plaintiffs' own insurance professionals, Mr. Stringer, Ms. Towne, and Ms. Merlino.   None of these individuals testify that "per occurrence" is vague.   None testify that it could mean "per sale" rather than "per accident."   Instead, their

testimony concerns the difficulty of obtaining an insurance policy because of the lack of an aggregate policy limit. Providing $10 million in coverage "per occurrence" is not the problem they suggest; the problem is unlimited potential liability. Section 28.455(3)(d) is not unconstitutionally vague, this Court concluded.

Dismissing the void for vagueness challenge, the Court then directed supplemental briefing on the remaining substantive due process claim.

**F**

Plaintiffs timely filed a supplemental brief on May 11, 2012, writing that they "concede that the State may regulate the sale, storage, etc., of such fireworks. Thus, Plaintiffs must prove that the legislation is unreasonable or arbitrary, with the presumption running to validity." Pls.' 7th Supp. Mem. 7, ECF No. 32 ("Pls.' Br."). Taking up this task, Plaintiffs ask rhetorically "what possible rational basis is there for requiring $10 million per location to sell consumer fireworks, but not having any insurance requirement, except at local option, for public displays of a substantially more powerful class of explosives?" *Id*. at 10. Plaintiffs further draw a contrast to other types of dangerous activities, noting:

> The legislature just agreed that motorcycle riders could go helmetless if they bought an additional $20,000 worth of insurance. The Liquor Control Commission will grant a license to operate a bar and sell any amount of alcohol while requiring only $100,000 in insurance. The above [$10 million insurance policy requirement] is the very definition of an arbitrary, capricious provision unrelated to public health safety or welfare.

*Id*. at 11. "Although Plaintiffs cannot definitively say that there is no industry or product in Michigan which is required to have as much or more insurance as a temporary tent or roadside consumer fireworks stand," Plaintiffs conclude, "there are none that come easily to mind or appear in the statutes." *Id*.

Defendant responded on May 24, 2012, arguing that Plaintiffs did not, and in fact "cannot show that the Legislature's decision to require retail locations that sell consumer fireworks to carry insurance is not rationally related to the State's legitimate interest in protecting the public health and safety." Def.'s Resp. to Pls.' 7th Supp. Mem. 19, ECF No. 35 ("Def.'s Resp."). Noting that Plaintiffs' "central issue is with the amount of the insurance, and not with the insurance requirement itself," Defendant asserts that Plaintiffs "may not invoke judicial review to argue about how much insurance coverage is appropriate to adequately protect the public from retail locations selling consumer fireworks. As the Supreme Court said in [*F.C.C. v. Beach Communications, Inc*., 508 U.S. 307 (1993)], the 'legislative choice is not subject to courtroom fact-finding.' " *Id*. at 12 (quoting *Beach Commc'ns*, 508 U.S. at 315). Moreover, Defendant asserts, "the Legislature was well aware of the debate within the industry surrounding the insurance requirement," *id*. at 13, explaining:

> There are significant dangers associated with selling consumer fireworks from tents, including the risk of significant travel distance of discharged fireworks, danger to adjacent structures, vehicles, and vendor tent locations are likely to be in high traffic areas near shopping areas where people may not even be aware of the risk that an adjacent tent selling consumer fireworks may pose. This testimony alone provides sufficient rational basis for the Legislature to conclude that $10 million in liability insurance was necessary to adequately protect the Michigan public.

*Id*. at 14. Finally, Defendant observes that the $10 million insurance requirement has not posed an insurmountable barrier to entry, noting: "At least 523 consumer fireworks sales certificates have been issued under the Act to date. Inspections of the retail locations have been conducted, and Michigan businesses are actively selling consumer fireworks under the new Act." *Id*. at 7.

## III

To survive a Rule 12(b)(6) motion to dismiss, the pleading "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v.*

*Iqbal*, 129 S. Ct. 1937, 1949 (2009). (internal quotation marks omitted) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the [party] pleads factual content that allows the court to draw the reasonable inference that the [opposing party] is liable for the misconduct alleged."  *Iqbal*, 129 S. Ct. at 1949 (citing *Twombly*, 550 U.S. at 555–56).  "In determining whether to grant a Rule 12(b)(6) motion, the court primarily considers the allegations in the complaint, although matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint, also may be taken into account."  *Nieman v. NLO, Inc*., 108 F.3d 1546, 1554 (6th Cir. 1997) (quotation marks omitted).

## IV

## A

"No state," the Due Process Clause of the Fourteenth Amendment provides, "[shall] deprive any person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV, § 2.  From the text, it is not immediately obvious that the protected "due process of law" includes substantive rights.[1]  Notwithstanding "the distinctly procedural cast of the clause's language," however, "there is a reasonable historical argument that, by 1868 [when the Fourteenth Amendment was enacted], a recognized meaning of the qualifying phrase 'of law' was substantive."  Lawrence Tribe, *American Constitutional Law* § 8–1, at 1332–33 (3d ed. 2000) (emphasis omitted).

---

[1] *See generally* John Hart Ely, *Democracy and Distrust* 18 (1980) (writing that " 'substantive due process' is a contradiction in terms — sort of like 'green pastel redness' "), *quoted in* Lawrence Tribe, *American Constitutional Law* § 8–1, at 1333 (3d ed. 2000); *but see generally* Charles L. Black, Jr., *A New Birth of Freedom: Human Rights, Named and Unnamed* 92 (1997) (writing that substantive due process "resembles a Zen Buddhist *Koan*, a saying that expresses or asks for the impossible, even the unimaginable, in order to tease or stimulate or press the mind or the spirit into a transcendent reality"), *quoted in* Tribe, *supra*, at 1333 n.7.

Writing in *Hurtado v. California*, 110 U.S. 516 (1884), for example, the Court held that "due process of law" incorporates substantive rights because "law" requires more than bicameralism and presentment — it requires the reasoned judgment:

> Law is something more than mere will exerted as an act of power. . . . It must be not a special rule for a particular person or a particular case, but, in the language of Mr. Webster, in his familiar definition, "the general law, a law which hears before it condemns, which proceeds upon inquiry, and renders judgment only after trial," so "that every citizen shall hold his life, liberty, property, and immunities under the protection of the general rules which govern society," and thus excluding, as not due process of law, acts of attainder, bills of pains and penalties, acts of confiscation, acts reversing judgments, and acts directly transferring one man's estate to another, legislative judgments and decrees, and other similar special, partial, and arbitrary exertions of power under the forms of legislation. Arbitrary power, enforcing its edicts to the injury of the persons and property of its subjects, is not law, whether manifested as the decree of a personal monarch or of an impersonal multitude.

*Id*. at 535–36. *Hurtado* involved a question of criminal law; however, the following decade the Court extended "substantive due process" protections to economic regulations.

In *Allgeyer v. Louisiana*, 165 U.S. 578 (1897), the Court took up (and then struck down as unconstitutional) a state statute requiring that all policies insuring marine property located in the state be issued by insurers licensed to do business in that state. The Court explained that the liberty protected by the Due Process Clause included the liberty to engage in lawful enterprises:

> The statute which forbids such act does not become due process of law, because it is inconsistent with the provisions of the constitution of the Union. The "liberty" mentioned in [the Fourteenth Amendment] means, not only the right of the citizen to be free from the mere physical restraint of his person, as by incarceration, but the term is deemed to embrace the right of the citizen to be free in the enjoyment of all his faculties; to be free to use them in all lawful ways; to live and work where he will; to earn his livelihood by any lawful calling; to pursue any livelihood or avocation; and for that purpose to enter into all contracts which may be proper, necessary, and essential to his carrying out to a successful conclusion the purposes above mentioned.

*Id*. at 589. Over the next four decades, "what is referred to (usually deprecatingly) as the *Lochner* era," the Court regularly held state and federal statutes regulating economic activity

unconstitutionally impaired the substantive due process rights of citizens by interfering with their liberty of contract.  *Stop the Beach Renourishment v. Fla. Dep't of Envtl. Prot.*, 120 S. Ct. 2592, 2602 (2010) (internal quotation marks omitted) (citing *Lochner v. New York*, 198 U.S. 45, 56–58 (1905)); *see generally* Tribe, *supra*, at 1344 n.4 (noting the "standard estimate" is that the Court invalidated 197 state and federal statutes pursuant to the Due Process Clause between 1899 and 1937).

In *New State Ice Co. v. Liebmann*, 285 U.S. 262 (1932), for example, the Court invalidated a state law prohibiting a person from manufacturing ice without a permit.  "Plainly," the Court wrote, "a regulation which has the effect of denying or unreasonably curtailing the common right to engage in a lawful private business, such as that under review, cannot be upheld consistent with the Fourteenth Amendment."  *Id*. at 278.  The Court further observed that "nothing is more clearly settled than that it is beyond the power of a state, under the guise of protecting the public, arbitrarily to interfere with private business or prohibit lawful occupations."  *Id*. (internal quotation marks and alterations omitted) (quoting *Burns Baking Co. v. Bryan*, 264 U. S. 504, 513 (1924)).

Notwithstanding that "nothing [was] more clearly settled" than the *Lochner* doctrine in the mid-1930s, soon thereafter the doctrine was "discarded."  *See Ferguson v. Skrupa*, 372 U.S. 726, 729, 730 (1963)  ("The doctrine that prevailed in *Lochner* . . . and like cases — that due process authorizes courts to hold laws unconstitutional when they believe the legislature has acted unwisely — has long since been discarded.  We have returned to the original constitutional

proposition that courts do not substitute their social and economic beliefs for the judgment of legislative bodies, who are elected to pass laws.").[2]

Fundamentally recalibrating the balance between private liberty and public power in *West Coast Hotel v. Parrish*, 300 U.S. 379 (1937), the Court held that the liberty protected by the Fourteenth Amendment was not an unfettered freedom of contract, but one bound up in the social contract:

> The Constitution does not speak of freedom of contract. It speaks of liberty and prohibits the deprivation of liberty without due process of law. In prohibiting that deprivation, the Constitution does not recognize an absolute and uncontrollable liberty. Liberty in each of its phases has its history and connotation. But the liberty safeguarded is liberty in a social organization which requires the protection of law against the evils which menace the health, safety, morals, and welfare of the people. Liberty under the Constitution is thus necessarily subject to the restraints of due process, and regulation which is reasonable in relation to its subject and is adopted in the interests of the community is due process.

*Id*. at 391–92; *see generally* Alexander M. Bickel, *The Least Dangerous Branch: The Supreme Court at the Bar of Politics* 16–17 (1962) (discussing "the counter-majoritarian difficulty" of judicial review, which "thwarts the will of representatives of the actual people of the here and now" and "exercises control, not in behalf of the prevailing majority, but against it").

Extending its holding the next year in *United States v. Carolene Products Co*., 304 U.S. 144 (1938), the Court wrote that "regulatory legislation affecting ordinary commercial transactions is not to be pronounced unconstitutional unless in the light of the facts made known or generally assumed it is of such a character as to preclude the assumption that it rests upon some rational basis within the knowledge and experience of the legislators." *Id*. at 152.

In the intervening seven decades, "not one law has been declared unconstitutional by the Supreme Court as violating economic substantive due process." Erwin Chemerinsky,

---

[2] What caused this shift— often referred to as "the switch in time that saved nine" — is subject to a rich, ongoing debate. *See generally* Barry Cushman, *The Hughes-Roberts Visit,* 15 Green Bag 2d 125 (2012); Daniel E. Ho & Kevin M. Quinn, *Did a Switch in Time Save Nine?*, 2 J. Legal Analysis 69 (2010).

*Constitutional Law*: *Principles and Policies* 628 (3d ed. 2006).  As the Court itself notes (with gracious understatement), the rational basis "standard of review is a paradigm of judicial restraint."  *F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 314 (1993).

## B

On rational basis review, a statute now enjoys "a strong presumption of validity, and those attacking the rationality of the legislative classification have the burden 'to negative every conceivable basis which might support it.' "  *Beach Commc'ns*, 508 U.S. at 314–15 (internal citation omitted) (citing *Lyng v. Auto. Workers,* 485 U.S. 360, 370 (1988), and quoting *Lehnhausen v. Lake Shore Auto Parts Co*., 410 U.S. 356, 364 (1973)).  "Moreover," the Court notes, "because we never require a legislature to articulate its reasons for enacting a statute, it is entirely irrelevant for constitutional purposes whether the conceived reason for the challenged distinction actually motivated the legislature.  Thus, the absence of legislative facts explaining the distinction on the record has no significance in rational-basis analysis."  *Beach Commc'ns*, 508 U.S. at 315 (internal alterations, citation, and quotation marks omitted) (citing *U.S. R.R. Ret. Bd. v. Fritz*, 449 U.S. 166, 179 (1980); *Flemming v. Nestor*, 363 U.S. 603, 612 (1960); and *Nordlinger v. Hahn*, 505 U.S. 1, 15 (1992)).  Likewise, "legislative choice is not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data."  *Beach Commc'ns*, 508 U.S. at 315 (citing *Vance v. Bradley*, 440 U.S. 93, 11 (1979)).  "These restraints on judicial review have added force," the Court further cautions, "where the legislature must necessarily engage in a process of line-drawing."  *Beach Commc'ns*, 508 U.S. at 315 (internal quotation marks omitted) (quoting *Fritz*, 449 U.S. at 179).

This deference to the political branches is founded on the very structure of our government.  "Under the system of government created by our Constitution, it is up to

legislatures, not courts, to decide on the wisdom and utility of legislation." *Ferguson v. Skrupa*, 372 U.S. 726, 729 (1963).  Because of the allocation of powers established by the constitution, "courts [ought] not substitute their social and economic beliefs for the judgment of legislative bodies, who are elected to pass laws." *Id*. at 730; *see Lochner*, 198 U.S. at 76 (1905) (Holmes, J., dissenting) ("This case is decided upon an economic theory . . . .  If it were a question whether I agreed with that theory, I should desire to study it further and long before making up my mind. But I do not conceive that to be my duty, because I strongly believe that my agreement or disagreement has nothing to do with the right of a majority to embody their opinions in law.").

Moreover, this deference is appropriate not only because of structural considerations (including the respective institutional competencies of the branches of government),[3] but also because of democratic considerations.  "The Constitution presumes that, absent some reason to infer antipathy, even improvident decisions will eventually be rectified by the democratic process and that judicial intervention is generally unwarranted no matter how unwisely we may think a political branch has acted." *Beach Commc'ns*, 508 U.S. at 314 (quotation marks omitted) (quoting *Bradley*, 440 U.S. at 97).

Illustrating the degree of deference given state legislatures, in *Williamson v. Lee Optical Co*., 348 U.S. 483 (1955), the Court upheld a state statute that forbid opticians from fitting or duplicating lenses "except upon written prescriptive authority of an Oklahoma licensed ophthalmologist or optometrist." *Id*. at 485.  The Court wrote: "The Oklahoma law may exact a needless, wasteful requirement in many cases.  But it is for the legislature, not the courts, to balance the advantages and disadvantages of the new requirement. . . .  It is enough that there is

---

[3]   *See generally* Henry M. Hart, Jr. & Albert M. Sacks, *The Legal Process: Basic Problems in the Making and Application of Law* (William N. Eskridge, Jr. & Philip P.Frickey eds., 1994); *but see generally* Richard Posner, *Theories of Economic Regulation*, 5 Bell J. Econ. & Mgmt. Sci. 335 *passim* (1974) (noting that among the most popular theories attempting to "explain the pattern of government intervention in the market" include both "public interest theory" and "capture theory").

an evil at hand for correction, and that it might be thought that the particular legislative measure was a rational way to correct it." *Id*. at 487, 488.

Similarly, in *Ferguson v. Skrupa*, 372 U.S. 726 (1963), the Court upheld a state law limiting the practice of debt-adjustment to licensed attorneys. "Unquestionably," the Court wrote, "there are arguments [against this statute], but such arguments are properly addressed to the legislature, not to us." *Id*. at 731. "The Kansas debt adjusting statute may be wise or unwise," the Court cautioned, "[b]ut relief, if any be needed, lies not with us but with the body constituted to pass laws for the State of Kansas." *Id*. at 732.

In this case, Plaintiffs concede that the legislature had a rational basis for requiring fireworks vendors purchase insurance — "protection of the public health, safety, and welfare." *See, e.g.*, Pls.' Resp. to Def.'s Mot. to Dismiss ¶ 10 ("Plaintiffs agree that the Legislature's decision to require retail fireworks locations to carry mandatory insurance is within its power.").

The sole issue is whether the specific amount required, $10 million, has any possible rational justification. Scenarios justifying such an amount come to mind readily — a spark causing an explosion in a crowded fireworks store, for example, or a carelessly discarded cigarette igniting an eruption in a fireworks tent in a busy mall parking lot. In fact, the legislative history suggests that such scenarios were actually considered by the legislature before enacting the $10 million insurance policy requirement:

> [I]f there was an accident and somebody was hurt and [the store] was busy and it was one of the senators that actually brought it up, if there [were] five people in there and they got hurt, would a million dollar policy be sufficient? And the answer to that is no. . . . Maybe even 10 million is not enough. As the states legalize, they're going more towards the 5 million dollar policy and now like in the State of California, nothing is written besides a 10 million dollar policy. You know I guess it's like auto insurance or anything else. At one time 1 million dollars seemed to be a lot of money. 10 million isn't anymore.

*Senate Regulatory Reform Comm. Hearing: House Bill 4293*, at 33 (Mich. Nov. 3, 2011). Even opponents of the insurance requirement testified regarding the risks associated with selling consumer fireworks. As noted, a representative of B.J. Alan Company testified:

> A fire in a tent will definitely result in aerial fireworks discharging and travelling substantial distances from the tent. If an aerial product is designed to climb 125 to 150 feet straight up, imagine the distance if the trajectory of the flaming product is of an arcing linear type. The danger to adjacent structures, vehicles and people would be significant especially considering the most popular and common tent locations are in the parking lot immediate vicinity of extreme high traffic areas such as big box chain stores, malls, strip plazas and gas stations.

*Id*. at 14. Considering these scenarios, the Court cannot conclude that the $10 million baseline that the Michigan legislature drew could only be the product of irrational minds. While this Court might draw a different baseline of the minimum insurance coverage required, if it were merely a question of what was wisest, the time has long since passed that the Court may enact its economic preferences, substituting them for that of the legislature. Defendant is entitled to judgment on Plaintiffs' substantive due process claim.

## C

Against this conclusion, Plaintiffs make a number of arguments. None, however, demonstrate that the statutory insurance requirement lacks a rational basis. For example, Plaintiffs argue, the Act is unconstitutional because "[t]here is no scientific authority on which Defendants do or can rely for MCL 28.455(3)'s irrational and onerous $10 million insurance requirement." Pls.' Mot. Prelim. Inj. ¶ 6; *see also* Pls.' Br. in Supp. of Resp. to Def.'s Mot. to Dismiss 9 ("MCL 28.455(3)'s requirement of $10 million coverage per occurrence per location is not rationally related to furthering that interest where the actual risks and losses associated with the sale and use of consumer fireworks is nowhere close to that amount."). As noted, the Supreme Court instructs that "legislative choice is not subject to courtroom fact-finding and may

be based on rational speculation unsupported by evidence or empirical data." *Beach Commc'ns*, 508 U.S. at 315.  Bound by this precedent, this Court cannot hold that the Act is unconstitutional because the Michigan legislature's choice did not expressly reference empirical data or "scientific authority."[4]

Likewise lacking merit is the argument that the insurance requirement lacks rational basis because other jurisdictions have not required the same amount of insurance.  Plaintiffs write:

> [M]any other state legislatures have analyzed this issue and concluded that the public interest would be served without requiring consumer fireworks retailers to carry insurance, or at most, to carry $1 million to $2 million in coverage.  Indeed, Michigan legislators recognized as much: When the Act was still known as HB 4293, it passed the House Regulatory Reform Committee with a $2 million insurance requirement.

Pls.' Br. Supp. Mot. Prelim. Inj. 6; *see also* Pls.' Mot. Prelim. Inj. ¶ 7 ("Where Michigan requires retailers of consumer fireworks to obtain insurance coverage in an amount five to ten times greater than that required by any other state, it is clear that MCL 28.455(3) cannot survive.").

That other states have adopted different minimum levels demonstrates not a flaw in Michigan's statute, but rather a strength of our system of government.  "It is one of the happy incidents of the federal system," Justice Brandeis once observed, "that a single courageous state may, if its citizens choose, serve as a laboratory; and try novel social and economic experiments without risk to the rest of the country."  *New State Ice Co. v. Liebmann*, 285 U.S. 262, 311 (1932) (Brandeis, J., dissenting).  Part of the genius of our federal constitution is its federalist character.  A state is not required to enact the same laws as its sister states.  Rather, learning

---

[4] Although not essential to the decision, the Court further notes that if Plaintiffs are in fact correct that "the actual risks and losses associated with the sale and use of consumer fireworks is nowhere close to [the $10 million insurance requirement]," competition in the insurance market can be expected to account for this.  Policy premiums, assuming a competitive market, will be based on expected risks, rendering the excess amount of insurance required largely surplusage in the calculation of policy rates.

from their examples, a state may calibrate its economic regulations to reflect the particular values of its citizens.

In the specific case of consumer fireworks, states have taken a variety of approaches. Some absolutely prohibit the sale of such fireworks, Plaintiffs' own expert acknowledges. *See* Steinburg Aff. ¶ 4. (Prior to January 1, 2012, this was the Michigan legislature's approach.) Others take a relatively laissez-faire approach, permitting the sale of consumer fireworks while imposing modest insurance requirements on the vendors. *Id*. Effective January 1, 2012, Michigan has chosen an intermediate course, permitting the sale of such fireworks, but imposing a more significant insurance requirement on the vendors. The Court cannot say that this intermediate course could only be the product of irrational minds. Rather, as in *Skrupa*, the legislature "was free to decide for itself" how stringently to regulate consumer fireworks. 372 U.S. at 731; *see also Beach Commc'ns*, 508 U.S. at 315 (noting that the "restraints on judicial review have added force where the legislature must necessarily engage in a process of line-drawing." (internal quotation marks omitted) (quoting *Fritz*, 449 U.S. at 179)).

Similarly without merit is the argument that the insurance requirement lacks a rational basis because it is significantly higher than that imposed by the Michigan legislature on motorcycle riders, dram shop operators, and firms putting on public fireworks displays. *See* Pls.' 7th Supp. Mem. 10, 11. "The legislature just agreed that motorcycle riders could go helmetless if they bought an additional $20,000 worth of insurance," Plaintiffs write, continuing: "The Liquor Control Commission will grant a license to operate a bar and sell any amount of alcohol while requiring only $100,000 in insurance. The above [$10 million insurance policy requirement] is the very definition of an arbitrary, capricious provision." *Id*.

Demonstrating that the legislature adopted relatively modest insurance requirements for one category of risks, however, does not eliminate "all possible rational justifications" for the legislature's decision regarding the risk at issue in this case. *Midkiff v. Adams Cnty. Reg. Water Dist.*, 409 F.3d 758, 770 (6th Cir. 2005). As in *Williamson*, the $10 million insurance policy "may exact a needless, wasteful requirement in many cases. But it is for the legislature, not the courts, to balance the advantages and disadvantages of the new requirement." 348 U.S. at 487. Plaintiffs' disagreement with the wisdom of the $10 million insurance policy should be addressed to the body that made it, the Michigan legislature. As noted, the time has long since passed that the Court may substitute its economic preferences for that of the legislature.

Finally, Plaintiffs assert that the insurance requirement lacks a rational basis because it presents an insurmountable barrier to entry into the market. Assuming that the premise is correct (that is, if the market is opened, any barriers to entry must be rational),[5] Plaintiffs' argument nevertheless lacks merit.

First, for the reasons detailed above, as a matter of law the Court cannot conclude that the $10 million insurance requirement lacks any rational justification. Second, as a factual matter, public records reveal that the insurance requirement has not proved to be an insurmountable barrier to entry into this newly authorized market — since the Act took effect six months ago, more than five hundred consumer fireworks sales certificates have been issued. *See* Michigan Bureau of Fire Services, *Consumer Fireworks Certificate Database*, (reporting

---

[5] As a threshold matter, it is not immediately obvious that the premise of this argument is correct (that is, it is not obvious that a state violates the federal constitution by blocking access to this particular market). *Cf. Burda Bros., Inc. v. Canton Township*, No. 195051, 1997 WL 33344716, at *2 (Mich. Ct. App. Jul. 1, 1997) (noting federal law does not preempt the Michigan state regulation precluding sale of consumer fireworks), *cited in Burda Bros., Inc. v. Walsh*, 22 F. App'x 423, 426 (6th Cir. 2002). Nevertheless, the Court concludes that Plaintiff is correct that while the legislature has the authority to close this market, if it is to be opened, it must be opened in a rational manner. *Cf. Republican Party of Minn. v. White*, 536 U.S. 765, 788 (2002) ("The greater power to dispense with elections altogether does not include the lesser power to conduct elections under conditions of state-imposed voter ignorance." (internal alterations omitted) (quoting *Renne v. Geary,* 501 U.S. 312, 349 (1991) (Marshall, J., dissenting)).

-34-

that as of June 1, 2012, Defendant has issued 566 consumer fireworks sales certificates), *available at* http://www7.dleg.state.mi.us/consumerfireworks/default.aspx (last visited June 1, 2012); *see generally Ashland, Inc. v. Oppenheimer & Co., Inc.*, 648 F.3d 461, 467 (noting that public records may be considered on Rule 12(b)(6) motions).

In sum, because it cannot be said that the Act's insurance requirement lacks a rational basis, the Court will grant Defendant's motion to dismiss the complaint.

**V**

Accordingly, it is **ORDERED** that Plaintiffs' motion for a preliminary injunction (ECF No. 2) is **DENIED**.

It is further **ORDERED** that Defendant's motion to dismiss (ECF No. 21) **GRANTED**.


s/Thomas L. Ludington
THOMAS L. LUDINGTON
United States District Judge

Dated: June 7, 2012

---

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on June 7, 2012.

s/Tracy A. Jacobs
TRACY A. JACOBS

---